IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES MICHAEL WEST, JR., | ) | |
| AIS #264345, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:13-CV-808-WHA |
| | ) | |
| CHRISTOPHER GORDY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This 42 U.S.C. § 1983 action is pending before the court on a complaint filed by James Michael West, Jr., a state inmate, challenging actions which occurred at the Ventress Correctional Facility from April of 2013 until the filing of this complaint in October of 2013.  West names Christopher Gordy, James Carlton and Sherwood Carter, all correctional officials employed at Ventress during the time relevant to the complaint, as defendants.

In the instant complaint, West alleges that the defendants violated his rights secured under the First Amendment by refusing him access to copies of Black Men magazine which contained photographs of nude women.  West further argues that the denial of these magazines deprived him of equal protection because white inmates were allowed to receive magazines with similar content.  West also asserts that the defendants' denial of the Black Men magazines and the removal of various pages/cards from his Country Living magazines

prior to delivery to him circumvented his right to due process.  West seeks a declaratory judgment, injunctive relief and monetary damages for the loss of his property.

The defendants filed a special report, supplemental special report and supporting evidentiary materials addressing the claims presented in the complaint.  In these documents, the defendants deny their actions violated West's constitutional rights.

Upon receipt of the defendants' special report, the court issued an order directing West to file a response to the report, including affidavits, sworn statements or other evidentiary materials.  *Order of March 5, 2014 - Doc. No. 16* at 2.  This order specifically cautioned West that unless "**sufficient legal cause**" is shown within fifteen days of entry of this order "**why such action should not be undertaken**, . . . the court may at any time [after expiration of the time for his filing a response to this order] and **without further notice to the parties** (1) treat the special report and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." *Id*. at 2-3.  West filed a response in opposition to the defendants' report, supported by affidavits on April 2, 2014.  The court also provided West an opportunity to file a response to the defendants' supplemental special report, *Doc. No. 21*, to which he filed no response within the time permitted by the court.

Pursuant to the directives of the order entered on March 5, 2014, the court deems it appropriate to treat the defendants' reports as a motion for summary judgment.  Thus, this case is now pending on the defendants' motion for summary judgment.   Upon

consideration of the defendants' motion for summary judgment, the evidentiary materials filed in support thereof, the sworn complaint and the response(s)? filed by West, the court concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (moving party has initial burden of showing there is no genuine dispute of material fact for trial). The movant may meet this burden by presenting evidence indicating there is no dispute of

---

[1]Although stylistic changers were made to Rule 56 in December of 2010, the revision of "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*. "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Despite these changes, the substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact with respect to the claims presented by the plaintiff. Based on the foregoing, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-594 (internal quotation marks omitted) (Once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.). This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.

*Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Public Education for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007).

> In civil actions filed by inmates, federal courts

> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted).  To proceed beyond the summary judgment stage, an inmate-plaintiff is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*.  "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Anderson*, 477 U.S. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment.  *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions . . ., in the absence of [admissible] supporting evidence, are insufficient to withstand summary

judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment[.]"); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. SouthWest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (summary judgment appropriate where no genuine dispute of material fact exists).  At the summary judgment stage, this court must "consider all evidence in the record . . . [including] pleadings, depositions, interrogatories, affidavits, etc. -- and can only grant summary judgment if everything in the record demonstrates that no genuine [dispute] of material fact exists."  *Strickland v. Norfolk Southern Railway Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. ZenithRadio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party

must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by appropriate and sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *West v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status does not mandate this court's disregard of elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After such review, the court finds that West has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.

### III.  ABSOLUTE IMMUNITY

To the extent West sues the defendants in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see*

*Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities."  *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, the defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.    *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

## IV.  DISCUSSION[2]

### A.  First Amendment

West complains that the defendants improperly withheld one or more of his Black Men magazines in violation of his Frist Amendment rights.   Specifically, West argues that denying him access to these magazines deprived him of his right to receive reading materials "which promote African American (black) women."  *Complaint - Doc. No. 1* at 2.  The defendants maintain that they rejected the magazines at issue because the publications contained photographs of nude women, some of which depicted women

---

[2] The court limits its review to the claims set forth in the complaint.  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Secretary, Florida Dept. of Corrections*, 502 F. App'x 905, 909-910 (11th Cir. 2012) (plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton County School District*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (district court correctly refused to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

covered only in body paint, and the defendants deemed the rejected magazines a potential threat to the security of the facility.

Under Administrative Regulation No. 448, inmates are "permitted to send and receive correspondence unless there is reasonable suspicion that such correspondence may present a threat to the safety and security of the facility, public, staff, or inmates." *Doc. No. 15-6* at 4. The regulation defines nudity as "[a] pictorial depiction where the genitalia or female breasts are exposed. Publications containing nudity illustrative of medical, educational, or anthropological content may be excluded from this definition." *Id*. at 3. Defendant Carter maintains that the magazines were inspected "to ensure that [they did] not contain material that would present a clear threat or danger to institutional security." *Doc. No. 15-2* at 2. Any magazine deemed to present a threat to security was denied. *Id*.

In an affidavit filed by Gwendolyn Mosley, an Institutional Coordinator for the Alabama Department of Corrections, explains the basis for rejection of publications containing nude photographs as follows:

> Sexual conduct of any kind is prohibited within the Alabama Department of Corrections. This is irrespective of a person's status as an inmate, employee . . . or volunteer, gender, or sexual preference. Moreover, explicit material or nudity that is not illustrative of medical, educational, or anthropological content is prohibited within ADOC institutions. This is also irrespective of the gender of the person in the depictions or the sexual preference of the possessor of those materials. Should an inmate receive such explicit content in the mail, the procedure for mail rejection is established by Administrative Regulation 448.
>
> The reasons why sexually explicit materials are banned are many and most involve increased risks of harassment and violence and decreased respect for authority.
>
> First, sexually explicit materials promote arousal and a sexually charged atmosphere amongst the inmate population, which could lead to

numerous threats to the safety and security of the institution, its staff, the staff of vendors on site, and its inmate population.  When such a sexually charged atmosphere is present, there is an increased risk[] that our female staff will face harassment, offensive remarks, demeaning treatment, lack of respect, and even sexual violence directed towards them--not just ADOC female staff but also that of the many female staff members employed by medical or mental health providers in our prisons, or female providers at outside medical providers.

The creation of a sexually charged environment could also lead to sexual harassment and even sexual violence directed toward other inmates by the inmate possessing the sexually explicit material.  In a time when both the federal and state authorities are placing an emphasis on the prevention of sexual misconduct in prisons (i.e., efforts made to comply with the Prison Rape Elimination Act), allowing such material sends the wrong message and fosters increased risk of harm.  The banned materials could lead to increased incidents of public masturbation, indecent exposure, and other lewd behavior (also prohibited activities).  This behavior is often directed toward female correctional, medical, or mental health staff.  These staff members, instead of being given the respect they deserve (and need to do their job), are seen as sexual objects existing only for the inmate's sexual gratification or desire for gender-based dominance.

Even when no female staff is in the area and masturbation is occurring, there have been many reported incidents of violence among inmates as a result of even a perception by another inmate that the masturbating inmate was "targeting" the other inmate (also known as "shotgunning" or "thirty-eighting" [after the former administrative regulation prohibiting such conduct].  This, too, leads to increased incidents of sexual harassment towards other inmates – which is strictly prohibited by regulation and the Prison Rape Elimination Act – as well as toward staff members, particularly female officers assigned [to the facility].

Unfortunately, ADOC staff have reacted violently (and inappropriately) toward inmates who were allegedly "targeting" them with their masturbation. . . .   The over-reaction of the staff was, of course, unjustified, but if one causative factor could be eliminated without any significant resulting harm, it should be.

Additionally, allowing for photographs containing explicit materials would promote bartering amongst the inmates or theft, both of which are prohibited activities that have led to incidents involving attacks or fights amongst inmates.  A lot of prison violence (including sexual violence) is the result of "debt" enforcement or revenge for theft of one inmate['s] belongings by another inmate.

* * *

Finally, permitting explicit materials within the ADOC diminishes the goal of rehabilitation for its inmate population. It denigrates authority by encouraging the violation of institutional rules (as described above) and promotes sexual deviance. These are counterproductive to the goal of rehabilitation. Many inmates are in prison because they acted out a deviate sexual desire, committed violence on a sexual partner or former sexual partner, or one competing for the attention of their sexual partner, or for crimes committed based on animus toward another due to sexual orientation.

The ADOC does not prohibit all reading materials from the inmate population. For instance, legal, general interest, fiction, history, [and] educational publications may be received by inmates in the mail. This is in addition to many facilities that have . . . libraries and the legal materials that are provided by ADOC to the inmates in the institutional law library in accordance with the ADOC's obligation to allow for meaningful access to the courts. All publications are subject to the approval of the Warden of the institution, or his designee. The need for inspection or approval is to ensure that the content of the publication is not otherwise in violation of ADOC policies – for instance, if the publications incite violence, provide instructions for escape or how to engage in criminal activity, contain sexually explicit content, or contain intoxicants that can easily be hidden (i.e., suboxone strips that are almost undetectable to the human eye but can be consumed by licking the page or back of the address label or postage). It is not an uncommon occurrence to find a seemingly appropriate publication has been altered or produced in such a way so as to include pornographic or otherwise prohibited materials, which necessitates the need for review and approval by the staff. In addition to security needs that are addressed, other factors that are related to the safety of the institution – and most specifically – the lack of personal or storage space at the institution. For that reason, inmates are limited to the personal property they may receive in the mail or otherwise. This includes the number of publications an inmate may have in his possession or the number of pictures allowed per inmate, which is limited to twenty.

*Defendants' Exh. 4 - Doc. No. 33-4* at 1-5 (footnote omitted).

Federal law recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807 (1974)]. As the *Martinez* Court acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they

are not readily susceptible of resolution by decree.'  *Id.*, at 404-405, 94 S.Ct., at 1807. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources."  *Turner v. Safley*, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259 (1987); *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (recognizing that because "the judiciary is ill-quipped to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.").  Correctional officials are therefore "accorded latitude in the administration of prison affairs[,]" *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081 (1972), which necessarily includes "the [inescapable] withdrawal or limitation of many [inmate] privileges and rights."  *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) (quotation marks and citation omitted).  "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration."  *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977).  Moreover, "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration."  *Turner*, 482 U.S. at 89.

"In the First Amendment context, . . . some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'"  *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S.Ct. 1475, 1479 (2001), quoting *Pell*,

417 U.S. at 822, 94 S.Ct. at 2804.  In accordance with this principle, an inmate's rights established under the First Amendment, including the right to receive publications, is not protected if allowing protection is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 822, 924 S.Ct. at 2804.  Thus, while inmates retain certain constitutional rights protected by the First Amendment, these rights are limited by the fact of incarceration and valid penological objectives such as maintaining institutional security and order.  The law is well settled that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell*, 417 U.S. at 823, 94 S.Ct. at 2804; *Bell v. Wolfish*, 441 U.S. at 546, 99 S.Ct. at 1878 ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees.").  It is therefore clear that preservation of security and order within a correctional facility is essential to the facility's effective administration and constitutes both a compelling and substantial governmental interest.  *Pell*, 417 U.S. at 823, 94 S.Ct. at 2804; *Lawson v. Singletary*, 85 F.3d 502, 512 (11th Cir. 1996); *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996).

In emphasizing the deference owed to prison officials, the Supreme Court in *Thornburgh* stated:

> We deal here with incoming publications, material requested by an individual inmate but targeted to a general audience.  Once in the prison, material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct.  Furthermore,

> prisoners may observe particular material in the possession of a fellow prisoner, draw inferences about their fellow's beliefs, sexual orientation, or gang affiliations from that material, and cause disorder by action accordingly.  As the Deputy Solicitor General noted at oral argument:  "The problem is not . . . in the individual reading the material in most cases.  The problem is the material getting into the prison."  In the volatile prison environment, it is essential that prison officials be given broad discretion to prevent such disorder.

490 U.S. at 412-413.  Thus, a prison official's action in regulating access to publications is valid if it is "reasonably related to legitimate penological interests."  *Thornburgh*, 490 U.S. at 409 (citing *Turner*, 482 U.S. at 89).  "The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).  A court must consider and balance the *Turner* factors in making this determination.

> The four factors identified in *Turner* are:

> (1) "whether the regulation has a valid, rational connection to a legitimate government interest;" (2) "whether alternative means are open to inmates to exercise the asserted right;" (3) "what impact an accommodation of the right would have on guards and inmates and prison resources;" and (4) "whether there are ready alternatives to the regulation."  The fourth factor considers whether "a prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal."  *Overton v. Bazzetta*, 539 U.S. 126, 136, 123 S.Ct. 2162, 2169, 156 L.Ed.2d 162 (2003).

*Brunskill v. Boyd*, 141 F. App'x 771, 774 (11th Cir. 2005).  However, a "court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors."  *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999); *Freeman v. Texas Department of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004) (interpreting the decision in *Turner* as

stating that a court need not weigh evenly or even consider each of the factors as rationality is the controlling standard).

Under the first factor, this court must consider whether there is a rational connection between the challenged regulation/action and a legitimate governmental interest. *Turner*, 482 U.S. at 89. In addition, the regulation must be neutral. *Id*. The ADOC's policy of excluding publications that contain nude photographs is expressly aimed at maintaining security, rehabilitating inmates and reducing sexual harassment of female staff members. "Safety, security, order [and] rehabilitative interests" are legitimate penological objectives. *Thornburgh*, 490 U.S. at 415 (internal quotations omitted). "The legitimacy of the Government's purpose in promulgating [the] regulation[] [at issue in this case] is beyond question. The regulation[] [is] expressly aimed at protecting prison security, a purpose this Court has said is central to all other corrections goals." *Id*.; *see also Pell*, 417 U.S. at 823 (finding rehabilitation of inmates a legitimate penological interest); *Martinez*, 416 U.S. at 413-414 (prison security, order and rehabilitation are legitimate government interests); *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999) ("[T]here is no doubt that protecting the safety of guards in general is a legitimate interest, and that reducing sexual harassment in particular likewise is legitimate."). In addition, the challenged regulation is unquestionably "neutral" within the definition promulgated by the Supreme Court in the context of mail coming into a prison. *See Thornburgh*, 490 U.S. at 415-416 ("Where, as here, prison administrators draw distinctions between publications solely on the basis of

their potential implications for prison security, the regulations are 'neutral' in the technical

sense in which we meant and used that term in *Turner*.").

> Finally, the requirement that the policy be rationally related to the jail's legitimate objectives is met in this case. To show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned material actually caused problems in the past, or that the materials are "likely" to cause problems in the future. *See Thornburgh*, 490 U.S. at 417, 109 S.Ct. 1874; *Casey* [*v. Lewis*, 4 F.3d 1516, 1521 (9th Cir. 1993)]. Moreover, it "does not matter whether [the court] agree[s] with" the defendants or whether the policy "in fact advances" the jail's legitimate interests. *See Amatel* [*v. Reno*, 156 F.3d 192, 199 (D.C. Cir. 1998)]. The only question that [a court] must answer is whether the defendants' judgment was "rational," that is, whether the defendants might reasonably have thought that the policy would advance its interests. *See id*.
>
> The relationship between the possession of sexually explicit materials and the problems sought to be addressed by the policy - sexual harassment of female officers, jail security and rehabilitation of inmates - is clear. In the past, inmates have used nude photographs to draw anatomical comparisons with the wives, girlfriends and mothers of other inmates, which in turn led to fights and disturbances by the inmates and created a security risk for both inmates and jail employees; to draw anatomical comparisons between the female detention officers and the persons depicted in the photographs; and to openly masturbate in front of and otherwise sexually harass the female officers.
>
> The relationship between the jail's policy of prohibiting the possession of sexually explicit materials and the goals of preventing sexual harassment of the female officers, inmate rehabilitation and maintenance of jail security is not so "remote as to render the policy arbitrary or irrational." *See Turner*, 482 U.S. at 89-90, 107 S.Ct. 2254; *Amatel*, 156 F.3d at 200-01; *Dawson* [*v. Scurr*, 986 F.2d 257, 261 (8th Cir. 1993)] (holding regulation restricting access to sexually explicit materials is rationally related to goals of prison security and inmate rehabilitation). Although . . . the "fit" between the policy and the jail's objectives is not "exact," an exact fit is not required. Rather, all that is required is that there be a "rational" connection between the policy and the jail's legitimate objectives. This standard is met.

*Mauro*, 188 F.3d at 1060.

The second *Turner* factor is "whether there are alternative means of expressing the right that remain open to prison inmates."  482 U.S. at 90.  "Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'"  *Id*.  When applying this factor, "the right in question must be viewed sensibly and expansively."  *Thornburgh*, 490 U.S. at 417 (quotations omitted).  Viewed "expansively," the right at issue here is West's First Amendment right to receive and read a range of publications so that he is not "shut . . . out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect."  *King v. Federal Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005).  There is no dispute that the regulation allows West to receive a wide array of publications, including those issues of Black Men that did not contain nude pictures and other magazines which did not pose a threat to security.  "The[] alternatives need not be ideal to [the plaintiff] for them to adequately satisfy the concerns raised by the second *Turner* factor."  *Singer v. Raemisch*, 593 F.3d 529, 539 (7th Cir. 2010).  "As the regulation[] at issue in the present case permit[s] a broad range of publications to be sent, received, and read, this factor is clearly satisfied."  *Thornburgh*, 490 U.S. at 417-418.

The third factor set forth in *Turner*, the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally[,]" 482 U.S. at 90, also cuts against West.  The defendants maintain that allowing West's magazines into the prison could create a risk of inmate violence and

disorder, foster the bartering of items among inmates, cause interference with inmate rehabilitation and spur an increase in the sexual harassment of female staff members.

> Here the class of publications to be excluded is limited to those found potentially detrimental to order and security; the likelihood that such material will circulate within the prison raises the prospect of precisely the kind of "ripple effect" with which the Court in *Turner* was concerned.  Where, as here, the right in question "can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike," *id*., at 92, 107 S.Ct. at 2263, the courts should defer to the "informed discretion of correctional officials," *id*., at 90, 107 S.Ct. at 2262.

*Thornburgh*, 490 U.S. at 418.  The defendants have demonstrated that accommodation is not reasonably practical.

Finally, the fourth *Turner* factor requires West to prove that there are "ready alternatives" to the regulation.  480 U.S. at 90.

> [T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation.  By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns.  This is not a "least restrictive alternative" test:  prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.  But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner*, 482 U.S. at 90-91 (citations omitted).  West has not identified any appropriate ready alternative and none is apparent to the court.  Thus, the denial of publications containing nude pictures is not an exaggerated response to the problems sought to be addressed by the defendants.

This court recognizes that "there may be a different, less restrictive means of achieving defendants' legitimate objectives.  Under *Thornburgh*, however, the defendants are not required to adopt the least restrictive means of achieving these objectives.  Rather, the defendants must simply ensure that the policy is reasonably related to legitimate penological interests."  *Mauro*, 188 F.3d at 1063.  In summary, upon application of the *Turner* factors, the court finds that the actions of the defendants about which West complains were reasonably related to legitimate penolgical interests and did not violate the First Amendment.

## B.  Equal Protection

West, an African American inmate, alleges that the defendants violated his right to equal protection by denying him Black Men magazines while allowing white inmates to receive magazines containing similar content as that of Black Men.  *Doc. No. 1* at 2.

"Despite the tendency of all rights 'to declare themselves absolute to their logical extreme,' there are obviously limits beyond which the equal protection analysis may not be pressed. . . .  The Fourteenth Amendment 'does not require absolute equality or precisely equal advantages,'. . . nor does it require the State to 'equalize [prison] conditions.'"  *Ross v. Moffitt*, 417 U.S. 600, 611-612 (1974); *Hammond v. Auburn University*, 669 F.Supp. 1555, 1563 (M.D. Ala. 1987) ("The Equal Protection Clause of the Fourteenth Amendment does not require all persons to be treated either identically or equally.").  To establish a claim cognizable under the Equal Protection Clause, "a prisoner must [at a minimum] demonstrate that (1) he is similarly situated to other prisoners who received more favorable

treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis. *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001); *Damiano v. Florida Parole and Prob. Comm'n,* 785 F.2d 929, 932-33 (11th Cir. 1986)." *Sweet v. Secretary, Department of Corrections*, 467 F.3d 1311, 1318-1319 (11th Cir. 2006). "[O]fficial action will not be held unconstitutional solely because it results in a . . . disproportionate impact. . . . Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-265 (1977). "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991). In a case such as this one, where the plaintiff challenges actions of prison officials, exceptionally clear proof of discrimination is required. *See Fuller v. Georgia Bd. of Pardons and Paroles,* 851 F.2d 1307, 1310 (11th Cir. 1988). Evidence which merely indicates disparity of treatment or even arbitrary administration of state powers, rather than instances of purposeful or invidious discrimination, is insufficient to show discriminatory intent. *McKleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Since this case is before the court on a properly supported motion for summary judgment from the defendants, West bears the burden of producing evidence which would be admissible at trial sufficient to show that the actions of the defendants in rejecting his Black Men magazines resulted from intentional discrimination. *Celotex*, 477 U.S. at 322-324; *Waddell*, 276 F.3d at 1279. The plaintiff cannot rest on conclusory allegations of a constitutional violation to defeat summary judgment nor is "[t]he mere existence of a scintilla of evidence in support of [his] position" sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252; *Waddell*, 276 F.3d at 1279 (conclusory allegations based solely on subjective beliefs are insufficient to oppose summary judgment). Instead, the law is clear that the plaintiff must present significant probative evidence of intentional discrimination to preclude summary judgment in favor of the defendants. *Anderson*, 477 U.S. at 249.

The defendants deny they undertook any action against West with respect to his Black Men magazines based on his race. *Doc. No. 15-1* at 2; *Doc. No. 15-2* at 2. Instead, the defendants maintain that the refusal to deliver such magazines to West was based solely on the determination, after a review of the magazines by correctional personnel, that the contents of the rejected magazines posed a threat to the security of the facility. West has utterly and completely failed to present evidence, significantly probative or otherwise, that race constituted a motivating factor in the actions of the defendants about which he complains. Other than West's self-serving, conclusory allegation that the defendants violated his equal protection rights, the record is devoid of admissible evidence that the

defendants acted in an intentionally discriminatory manner. The allegations presented by West do not warrant an inference of discriminatory intent as the showing of a disparate impact upon inmates is insufficient to demonstrate an equal protection violation. *Sweet*, 467 F.3d at 1319; *E & T Realty*, 830 F.2d at 1114-1115; *Horner v. Kentucky High School Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994). Moreover, the arbitrary application of administrative rules, policies or procedures does not constitute a violation of the Constitution. *E & T Realty*, 830 F.2d at 1114. Thus, the defendants are entitled to summary judgment on the equal protection claim arising from alleged racial discrimination.

## C.  Due Process

West complains that the defendants intentionally, unlawfully and without authorization denied him delivery of his Black Men magazines, tore recipes from his Country Living magazine, removed subscription renewal notices and opened fragrance samples in violation of his right to due process. These allegations, however, fail to implicate the due process protection afforded by the Constitution as "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 537 (1981), overruled in other part by *Daniels v. Williams*, 424 U.S. 327 (1986) (holding that an individual deprived of property by an "unauthorized act" of a state official has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy); *Lindsey v. Storey*, 936 F.2d 554, 561

(11th Cir. 1991) (emphasis in original) (No due process violation occurs "as long as *some* adequate postdeprivation remedy is available."); *Rodriguez-Mora v. Baker*, 792 F.2d 1524, 1527 (11th Cir. 1986) (Inmate's claim that deputy marshal failed to return ring to inmate, whether due to negligence or an intentional act, provided no basis for relief as neither a negligent loss of property nor an intentional deprivation of property constitutes a violation of due process. ); *Holloway v. Walker*, 790 F.2d 1170, 1173-1174 (5th Cir. 1986) (finding no breach of federally guaranteed constitutional rights, even where high level state employee intentionally engages in tortious conduct, as long as the state system as a whole provides due process).  This court has routinely and consistently applied the holding of *Hudson* and its progeny to deny due process claims brought by inmates challenging actions of state officials regarding deprivations of their property.  *See McClellan v. Alabama*, Civil Action No. 2:11-CV-466-ID, 2011 WL 3423940 (M.D. Ala. 2011);  *Flournoy v. Culver*, et al., Civil Action No. 1:10-CV-104-ID, 2010 WL 916577 (M. D. Ala. 2010); *Dunklin v. Riley*, et al., Civil Action No. 2:06-CV-1063-MEF, 2009 WL 3624706 (M.D. Ala. 2009); *Malone v. Boyd*, et al., Civil Action No. 2:09-CV-217-TMH, 2009 WL 1064903 (M.D. Ala. 2009); *Carter v. Valeska*, et al., Civil Action No. 1:08-CV-858-TMH, 2008 WL 5245618 (M.D. Ala. 2008); *Salmon v. Turner*, Civil Action No. 1:08-CV-554-TMH, 2008 WL 3286982 (M.D. Ala. 2008); and *Todd v. Jones*, et al., Civil Action No. 3:07-CV-1021-WKW, 2007 WL 4510340 (M.D. Ala. 2007).

"[T]he Alabama legislature has created a statute providing a tort remedy for the unlawful deprivation or interference with an owner's possession of personalty. *Ala. Code*

§ 6-5-260 (1975).  Moreover, an aggrieved person may file a claim with the state Board of Adjustment to recover damages to property [or for a loss of property] caused by the state of Alabama or any of its agencies.  *Ala. Code* § 41-9-60 91975).”  *Browning v. City of Wedowee, Ala.*, 883 F.Supp. 618, 623 (M.D. Ala. 1995).[3]  Thus, the State of Alabama provides meaningful post-deprivation remedies for West to seek redress of the defendants’ allegedly improper denial of his Black Men magazines and the alleged damage caused to his other magazines.  Consequently, under no set of facts could West succeed on his due process claim and summary judgment is therefore due to be granted in favor of the defendants on this claim.

### D.  Violation of Administrative Regulation

Insofar as West asserts that the defendants violated the administrative regulation governing delivery of inmate mail, he is entitled to no relief.  The law is well-settled that infringements of agency rules, regulations, policies or procedures do not, without more, amount to constitutional violations. *See Magluta v. Samples,* 375 F.3d 1269, 1279 n. 7 (11th Cir. 2004) (mere fact governmental agency’s regulations or procedures may have been violated does not, standing alone, raise a constitutional issue); *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007) (defendant’s failure to comply with an administrative rule or policy does not itself rise to the level of a constitutional violation); *Myers v.*

---

[3]West concedes the availability of a remedy before the Alabama Board of Adjustment.  *Doc. No. 19* at 4.  Despite this concession, West asserts that he should be allowed to proceed on his due process claim before this court because the prison facility did not have a copy of the Board’s form complaint for his use in filing a claim.  The court finds that this assertion did not provide an exemption to West from seeking relief from the Alabama Board of Adjustment.  Specifically, it is clear that West could have simply filed a claim with the Board on standard paper or requested a form from the Board for use in filing a claim.

*Klevenhagen,* 97 F.3d 91, 94 (5th Cir. 1996) (claim that prison officials have not followed their own policies and procedures does not, without more, amount to a constitutional violation); *United States v. Caceres,* 440 U.S. 741, 751-752 (1979) (mere violations of agency regulations do not raise constitutional questions); *Weatherholt v. Bradley,* 316 F. App'x 300, 303 (4th Cir. 2009) (same); *see also Riccio v. Cnty. of Fairfax,* 907 F.2d 1459, 1459 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by its law is not a federal violation). Section 1983 is limited to providing a remedy for violations of federal not state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 91982). For these reasons, the defendants are entitled to summary judgment on West's claims alleging violations of an internal regulation.

## E.  State Law

To the extent West asserts that the actions of the defendants violated state law, review of these claims is appropriate only upon utilization of this court's supplemental jurisdiction. In the posture of this case, however, the court finds that exercise of such jurisdiction is inappropriate.

For a federal court "[t]o exercise [supplemental] jurisdiction over state law claims not otherwise cognizable in federal court, 'the court must have jurisdiction over a substantial federal claim and the federal and state claims must derive from a "common nucleus of operative fact."'" *L.A. Draper and Son v. Wheelabrator Frye, Inc.*, 735 F.2d 414, 427 (11th Cir. 1984). The exercise of supplemental jurisdiction is completely

discretionary. *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).  "If the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the state claims." *L.A. Draper and Son*, 735 F.2d at 428.  In view of this court's resolution of the federal claims presented in the complaint, any pendent state claim is due to be dismissed.  *Gibbs,* 383 U.S. at 726 (if the federal claims are dismissed prior to trial, the state claims should be dismissed as well); *see also Ray v. Tennessee Valley Authority*, 677 F.2d 818 (11th Cir. 1982).

## V.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motion for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  No costs be taxed herein.

It is further

ORDERED that on or before February 24, 2017 the parties may file objections to this Recommendation.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party

to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 7th day of February, 2017.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE